IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ELLICEY ADALBERTO PACHECO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:05CV293 |
| | ) | |
| SEARS, ROEBUCK AND CO., and | ) | |
| SEARS AUTO CENTER, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

BEATY, District Judge.

This matter comes before this Court pursuant to a Motion for Summary Judgment [Document #27] by Defendants Sears, Roebuck and Co. and Sears Auto Center ("Defendants"). Plaintiff Ellicey Adalberto Pacheco ("Plaintiff" or "Mr. Pacheco") brings this suit pursuant to 42 U.S.C. § 1981, alleging discrimination on the basis of race. Plaintiff also brings a claim pursuant to 42 U.S.C. § 2000a for denial of public accommodation on the basis of race. Specifically, Plaintiff claims that he was unable to obtain car service at a Sears Auto Center because he is Hispanic. For the reasons discussed below, Defendants' Motion for Summary Judgment will be granted.

I.  FACTUAL HISTORY

Ellicey Adalberto Pacheco is of Hispanic descent and has lived in the United States for the past seven years after moving here from Venezuela. Mr. Pacheco speaks some English, but presented his testimony and statements at his deposition through one of his daughters, Monica

Steffen, who acted as an interpreter. (Pacheco Dep. at 5.) According to Mr. Pacheco, he visited the Sears Auto Center in Durham, North Carolina on Wednesday, February 16, 2005, to get his vehicle aligned. (Pacheco Dep. at 9.) Mr. Pacheco testified that he had previously taken his vehicle to that Sears Auto Center and gotten an alignment without any problems or complaints, and that he was treated kindly and politely on that prior occasion. (Pacheco Dep. at 9.)

With respect to the present suit, Mr. Pacheco testified that he took his vehicle to the Auto Center at approximately 4:00 p.m. on February 16, 2005, and spoke with Sears employee Mario Mapson, who was working as a Customer Service Advisor. According to Mr. Pacheco, "[t]hey questioned me my name, my address, my phone number. Put in the computer. Say, I have, How many time my car is ready. They say one hour, one-hour-and-a-half. You have telephone cellular? Say me, Yes. What your telephone, cellular phone? 575 – my telephone number. He say, I call you when car was ready." (Pacheco Dep. at 11.) According to Mr. Pacheco, Mr. Mapson was polite and did not have trouble understanding Mr. Pacheco, and the conversation "was good." (Pacheco Dep. at 11.) According to the Sears Work Order for Mr. Pacheco's vehicle, the work order for a "wheel alignment service" was printed at 4:30 p.m. and was signed by Mr. Pacheco. (Jeffries Aff. Ex. A.) Mr. Pacheco walked over to the mall to wait until they called him. According to Mr. Mapson, Mr. Pacheco's vehicle was "placed in line for service" after Mr. Pacheco dropped it off. However, "[i]t took some time for the technician on duty to reach Mr. Pacheco's vehicle because a vehicle in front of Mr. Pacheco's vehicle took a long period of time to finish work on." (Mapson Aff. at ¶ 4.)

2

At approximately 6:00 p.m., Mr. Pacheco had not yet heard back and decided to go to the Auto Center to check on his vehicle. Mr. Pacheco contends that when he entered the Auto Center, he heard an employee say "danger" and several other employees started laughing, although he does not know what they were discussing or referring to. (Pacheco Aff. at ¶ 8.) According to Mr. Pacheco, he asked Mr. Mapson "at what time my car was going to be ready and at what time the store was going to be closed." (Pacheco Dep. at 15.) Mr. Mapson said that "[w]e close at 8:00 and I will call you when your car is ready." (Pacheco Dep. at 15.) Mr. Pacheco asked why he hadn't been called, and "they showed me the list of cars to be serviced and I saw that mine was next." (Pacheco Aff. at ¶ 8.) Mr. Mapson was polite and the conversation was "good." (Pacheco Dep. at 15.) Mr. Pacheco went back to the mall to wait, and then checked again at approximately 7:00 p.m. "to ask if the car was ready." (Pacheco Dep. at 15.) He contends that he "was told again that it would still be another hour before being ready." (Pacheco Aff. at ¶ 9.)

When the technician, Albert Jeffries, reached Mr. Pacheco's vehicle, he determined that there was "some movement on both sides of the inner tie rods" and as a result he was unable to perform the alignment without first replacing the tie rods. (Jeffries Aff. at ¶ 7.) Mr. Jeffries, who was classified as a Technician III and had over 20 years of experience as a motor vehicle technician, was the only technician at the Sears Auto Center on February 16, 2005, who was trained and certified to perform alignments. (Jeffries Aff. at ¶ 5.) In Mr. Jeffries' opinion, "[t]rying to perform the alignment without replacing the tie rods would have caused major safety

3

concerns." (Jeffries Aff. at ¶ 7.) Mr. Jeffries noted his determination on his work-up of Mr. Pacheco's vehicle on February 16, 2005. (Jeffries Aff. Ex. B.) According to the documentation and work-up of Mr. Pacheco's vehicle, the computer inspection of Mr. Pacheco's vehicle was completed and printed at 6:59 p.m. At the time Mr. Jeffries made this determination, he had not seen or spoken with Mr. Pacheco, and did not know Mr. Pacheco's race or national origin.

According to Mr. Mapson, Mr. Jeffries told him that "Mr. Pacheco's vehicle needed some additional parts in order for Mr. Jeffries to be able to do the alignment correctly." (Mapson Aff. at ¶ 7.) Sears did not have the parts in stock and the Parts Department was closed, so there was no way to obtain the parts that evening. (Mapson Aff. at ¶ 7.) Mr. Mapson contends that he paged Mr. Pacheco to tell him this, but Mr. Pacheco contends that he did not receive a call from Mr. Mapson and that his telephone was not set up to accept a page. (Mapson Aff. at ¶ 7; Pacheco Aff. at ¶ 11 - 14.)

Mr. Pacheco became worried about getting his vehicle back before the Auto Center closed, and decided to call one of his daughters, Mariana Pacheco. Mr. Pacheco and his daughter went to the Auto Center at approximately 7:55 p.m. to pick up his vehicle. When they arrived, Mr. Mapson told them the vehicle had not been aligned. According to Mr. Pacheco, Mr. Mapson told him that "we couldn't fix the car because the car has got something in the tires." (Pacheco Dep. at 19.) According to Mr. Pacheco's daughter, Mariana, Mr. Mapson "told me that they couldn't do anything to the car because something was wrong with the car," and that she then began to question how long they had known this and why they had waited so long to let Mr.

4

Pacheco know. (Mariana Pacheco Dep. at 11.) According to Mr. Pacheco, "my daughter asked why he made her father wait for four hours if at the last hour they weren't going to fix his car." (Pacheco Aff. at ¶ 10.) Mr. Pacheco noted that during this exchange, "[w]hen we both were talking to each other, the voice was different than in the beginning when I arrived to the store" and "both of our voices" were "a little different" and Mr. Mapson "was raising a little more his voice – or a different type of voice at the end when he was talking to us." (Pacheco Dep. at 26.)

During this exchange, Mr. Pacheco contends that Mr. Mapson asked Mariana if her father spoke English. According to Mr. Pacheco, Mariana said "not very well but enough to understand about the car." (Pacheco Aff. at ¶ 10.) Mr. Pacheco contends that Mr. Mapson then said that "if he doesn't speak English then he didn't care." (Pacheco Aff. at ¶ 10.) Mr. Pacheco and his daughter asked to speak to a manager, to which Mr. Mapson allegedly responded again, "No" and "I don't care." (Pacheco Aff. at ¶ 10.) Mr. Pacheco contends that Mr. Mapson "threw the keys across the counter in a rude way. He told us to leave because the store was closing." (Pacheco Aff. at ¶ 10.) Mr. Mapson denies making any comments regarding whether Mr. Pacheco spoke English, and denies "throwing" the keys across the counter. Mr. Mapson also contends that Mr. Pacheco's daughter was "yelling at me and would barely let me get in a word." (Mapson Aff. at ¶ 9.) Another Sears employee who was present during the exchange noted that the young lady who was with Mr. Pacheco "verbally attacked Mario [Mapson], aggressively yelling a list of demands." (Pl.'s Ex. F [Document #34].) Mr. Pacheco alleges that he and his daughter left the store and later called and left messages with the manager at Sears regarding this incident, but

5

never received a return call. (Pacheco Aff. at ¶ 19.)

According to Mr. Pacheco, he went to Tire King two days later and obtained a wheel alignment, and no one there mentioned any faulty or worn parts on his vehicle. (Pacheco Aff. at ¶ 16.) In response, Mr. Jeffries contends that an alignment was possible without replacing the tie rods, but was unsafe in his opinion. (Jeffries Aff. at ¶ 12.)

Mr. Pacheco contends that this encounter at the Sears Auto Center amounts to discrimination in violation of 42 U.S.C. § 1981. According to Mr. Pacheco, "I believe because my English is not perfect and because I speak other language, that I was mistreated that way. I don't have any other reason to think why they make me wait." (Pacheco Dep. at 28.) However, Mr. Pacheco concedes that he was given the work-up on his vehicle, and that "they told me they couldn't fix the car for something there. That is the explanation on this page" and he doesn't know "if they were telling me the truth or not." (Pacheco Dep. at 29.) Mr. Pacheco contends, moreover, that even if it were the truth, it was still discrimination to make him wait for four hours if they weren't going to be able to fix his vehicle, and "[n]ever before they made me wait for so long before in the United States. (Pacheco Dep. at 29, 32.)

Mr. Pacheco also contends that the Auto Center acted in a discriminatory manner because "other wheel alignments were performed for customers without Hispanic last names" based on Sears Auto Center records for February 16, 2005. In response, Defendants note that the records actually show numerous customers with "Hispanic last names" on that day, including at least one customer, Larua Rodriguez, who obtained a wheel alignment service.

6

Defendants have moved for summary judgment as to all of Plaintiff's claims, contending that Plaintiff cannot show a violation of 42 U.S.C. § 1981 and that Plaintiff has presented no evidence of discriminatory intent by Defendants. Defendants also contend that they have presented a legitimate non-discriminatory reason for the delay and the ultimate inability to perform the alignment on Mr. Pacheco's vehicle. Specifically, Defendants contend that the delay was based on the number of cars being serviced that evening ahead of Mr. Pacheco and the problem with Mr. Pacheco's tie rods once the technician was finally able to reach his vehicle. Defendants further contend that for the same reasons that Plaintiff's § 1981 claim fails, his § 2000a claim fails as well. In response, Plaintiff contends that summary judgment is not appropriate because there are disputed issues of fact that must be resolved by the jury as the fact finder.

With this summary of the facts as presented by both parties, the Court will turn to a consideration of Defendants' present Motion for Summary Judgment to determine whether Defendants are entitled to a summary judgment as to all of Plaintiff's claims.

## II. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is considered "material" if it "might affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). There can be "no genuine issue as to any material fact" if the non-moving party fails

7

to "make a showing sufficient to establish the existence of an element essential to that party's case," since "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). Under this standard, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S. Ct. at 2510. As a result, the Court will only enter summary judgment in favor of the moving party when " 'the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the [nonmoving] party cannot prevail under any circumstances.' " Campbell v. Hewitt, Coleman & Assocs., 21 F.3d 52, 55 (4th Cir. 1994) (quoting Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co., 381 F.2d 245, 249 (4th Cir. 1967)).

When ruling on a summary judgment motion, the Court "view[s] the evidence in the light most favorable to the non-moving party, granting that party the benefit of all reasonable inferences." Bailey v. Blue Cross & Blue Shield, 67 F.3d 53, 56 (4th Cir. 1995). The moving party bears the initial "burden of establishing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law." Catawba Indian Tribe v. South Carolina, 978 F.2d 1334, 1339 (4th Cir. 1992)(en banc). Once the moving party has met this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. Id. In so doing, the nonmoving party may not rest on mere allegations, denials, or unsupported assertions, but must, through affidavits or otherwise, provide evidence of a genuine dispute.

8

Anderson, 477 U.S. at 248–49, 106 S. Ct. at 2510; Catawba Indian Tribe, 978 F.2d at 1339. In other words, the nonmoving party must show "more than . . . some metaphysical doubt as to the material facts," for the mere existence of a scintilla of evidence in support of its position is insufficient to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986); Catawba Indian Tribe, 978 F.2d at 1339. Defendants have asserted their Motion for Summary Judgment with respect to all of Plaintiff's claims. The Court will address Defendants' Motion in turn with respect to each of Plaintiff's claims.

    A.    42 U.S.C. § 1981

Section 1981 grants all persons within the jurisdiction of the United States "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). This right extends to "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Id. § 1981(b). To prove a violation of § 1981, a plaintiff must be able to show that he is (1) a member of a racial minority, (2) that the defendant intended to discriminate against him on the basis of race, and (3) the discrimination concerned a privilege protected under § 1981. See Morris v. Dillard Dep't Stores, Inc., 277 F.3d 743, 751 (5th Cir. 2001).

Plaintiff may meet his burden to prove that race was a determining factor in one of two ways: "under ordinary principles of proof by any direct or indirect evidence relevant to and sufficiently probative of the issue," Goldberg v. B. Green & Co., 836 F.2d 845, 847 (4th Cir.

9

1988), or through the judicially created, burden-shifting proof scheme created for Title VII in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), which has been subsequently applied in §§ 1981 and 1982 cases to allow plaintiffs to defeat summary judgment in cases where plaintiffs do not have direct or indirect evidence of discrimination. See Dobson v. Cent. Carolina Bank & Trust Co., 240 F. Supp. 2d 516, 520 (M.D.N.C. 2003).

1. Direct Evidence of Intent to Discriminate

To proceed under a direct evidence theory, Plaintiff must present sufficient evidence to establish that Defendants intended to discriminate against him on the basis of race. In the present case, Plaintiff does not attempt to proceed under a direct evidence theory. Moreover, the Court finds that Mr. Mapson's alleged statements asking whether Plaintiff spoke English and then saying, "If he doesn't speak English, I don't care," are too speculative to support the conclusion that Sears Auto Center intentionally discriminated against Plaintiff based on his race. "Evidence is too speculative if the factfinder cannot rationally choose between mere 'possibilities' of meanings." Johnson v. Toys "R" Us Delaware, Inc., 95 Fed. Appx. 1 (4th Cir. 2004) (unpublished); see also Eddy v. Waffle House, Inc., 335 F. Supp. 2d 693, 698 n.7 (D.S.C. 2004) (noting that evidence is too speculative to be direct evidence where it does not "reflect directly the alleged discriminatory attitude and . . . bear directly on the contested . . . decision." (citation omitted)). Similarly, with respect to Plaintiff's contention that some employees said the word "danger" and laughed among themselves when Plaintiff came back into the store at 6:00 p.m., those statements are entirely speculative, as Plaintiff freely admits that he does not know what

10

the employees were discussing among themselves or whether they were referring to him at all. In addition, the statements were allegedly made by Mr. Mapson or other customer service employees, not by Mr. Jeffries, and it is undisputed that it was Mr. Jeffries, who did not know Mr. Pacheco's race, who determined that an alignment could not be performed on Plaintiff's vehicle that evening. As such, Plaintiff could not, and has not, proceeded under a "direct evidence" theory. Therefore, because Plaintiff's discrimination claim is not based upon direct evidence, but rather is based on alleged disparate treatment creating an inference of discrimination, it is governed by the familiar McDonnell Douglas burden-shifting analysis.

2. McDonnell Douglas Burden Shifting Scheme

Under the McDonnell Douglas proof scheme, a plaintiff must first establish a prima facie case of discrimination by a preponderance of the evidence. See Dobson, 240 F. Supp. 2d at 520. Subsequently, the burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. Id. If the defendant makes such a showing, the burden then shifts to the plaintiff to present evidence to prove that the defendant's articulated reason is pretext for unlawful discrimination. Id.

a. Plaintiff's Prima Facie Case

In order to establish a prima facie case of racial discrimination under McDonnell Douglas, Plaintiff must establish that (1) he is a member of a protected class, (2) he sought to enter a contractual relationship with Defendants, (3) he met the Defendants' ordinary requirements to pay for and to receive services ordinarily provided by the Defendants to other similarly situated

11

customers, and (4) he was denied the opportunity to contract for goods or services that were otherwise afforded to persons outside of the protected class.  See Williams v. Staples, Inc., 372 F.3d 662, 667 (4th Cir. 2004).  In cases where there were no other customers with whom to compare the treatment that Plaintiff received, Plaintiff can also satisfy this fourth element by showing that he received services in a markedly hostile manner and in a manner which a reasonable person would find objectively unreasonable.  Id. at 668 n.5; see also Dobson, 240 F. Supp. 2d at 520; Callwood v. Dave & Buster's, Inc., 98 F. Supp. 2d 694, 707 (D. Md. 2000).

Applying these standards in the present case, Plaintiff complains that the following incidents were objectively unreasonable and markedly hostile so as to rise to the level of violating Plaintiff's civil rights: (1) the length of the delay by the Auto Center before examining his vehicle; (2) the determination by the Auto Center not to perform the alignment; (3) the alleged failure of Mr. Mapson to call Plaintiff as soon as a determination was made regarding his vehicle; and (4) the allegedly rude comments and treatment when Mr. Pacheco and his daughter came to pick up the vehicle and question Mr. Mapson regarding the delay.  To create an inference of discrimination based on these incidents, Plaintiff must establish that the conduct "is (1) so profoundly contrary to the manifest financial interests of the merchant and/or her employees; (2) so far outside of widely-accepted business norms; and (3) so arbitrary on its face, that the conduct supports a rational inference of discrimination." Christian v. Wal-Mart Stores, Inc., 252 F.3d 862, 871 (6th Cir. 2001) (citing Callwood, 98 F. Supp. 2d at 708.).

12

The Court has reviewed each of Plaintiff's contentions and concludes that none of the alleged incidents were markedly hostile or were such that a reasonable person would find them objectively unreasonable. First, with respect to the alleged delay, the evidence in the light most favorable to Plaintiff establishes that Plaintiff dropped off his vehicle at approximately 4:30 p.m. and was told it would be 1½ hours, that he went back to check after 1½ hours and was told that his vehicle was next, that his vehicle was examined within the next hour, and that a diagnostic report was prepared on his vehicle by 6:59 p.m. In this Court's view, an unsurprising delay of 2 to 3 hours in obtaining vehicle service after dropping off a vehicle in the evening on a walk-in basis without an appointment is not uncommon, and certainly does not rise to the level of being "so far outside of widely-accepted business norms" and "so arbitrary on its face" as to support an inference of discrimination. In fact, as other courts have noted in similar situations, "[w]hile inconvenient, frustrating and all too common, the mere fact of slow service . . . does not . . . rise to the level of violating one's civil rights." Robertson v. Burger King, Inc., 848 F. Supp. 78, 81 (E.D. La. 1994). Similarly with respect to Mr. Mapson's alleged failure to call Mr. Pacheco regarding the status of his vehicle, it appears that Mr. Pacheco checked with the Auto Center several times that evening, and was informed each time as to the status of his vehicle. In addition, Mr. Mapson did not have any specific information regarding the vehicle from the technician until after 7:00 p.m. when the work-up and diagnostic information was generated. Mr. Pacheco and his daughter went to the Auto Center to pick up the vehicle less than an hour later. Assuming for purposes of this Motion that Mr. Mapson did not call Plaintiff during that hour regarding the

13

status of his vehicle, the Court nevertheless concludes that Mr. Mapson's conduct was not so objectively unreasonable or arbitrary as to create an inference of discrimination. While understandably frustrating to Mr. Pacheco, the alleged delay in communicating with Plaintiff regarding the status of his vehicle was not "markedly hostile" or "objectively unreasonable" under the circumstances alleged by Plaintiff.

With regard to Plaintiff's encounter with Mr. Mapson when Plaintiff came to pick up his vehicle, under Plaintiff's version of events, Mr. Mapson told them that the alignment was not performed because of "something in the tires" and because "something was wrong with the car." After Plaintiff and his daughter questioned Mr. Mapson regarding this result and the delay in evaluating the vehicle and communicating with Plaintiff, Mr. Mapson asked whether Mr. Pacheco spoke English and then stated that "if he doesn't speak English, I don't care." When Mr. Pacheco and his daughter asked to speak to a manager, Mr. Mapson said "no" and again stated that "he didn't care." Mr. Mapson then tossed Plaintiff's keys on the counter. The Court finds that, again, Plaintiff may have been frustrated by this encounter, but Plaintiff has not offered any evidence that Mr. Mapson behaved any differently toward other customers or in an arbitrary or objectively unreasonable manner. In fact, Plaintiff concedes that Mr. Mapson was polite and courteous in all of their previous encounters that evening. Only after Plaintiff and his daughter began challenging Mr. Mapson regarding the delay and the inability to perform the alignment, and they all began to use "different voices," did Mr. Mapson indicate a difficulty with the language barrier and ask whether Mr. Pacheco spoke English. That encounter, as alleged by

14

Plaintiff, is indicative of an exchange between a dissatisfied customer and a service provider, and is not so arbitrary or outside widely accepted business norms as to indicate a civil rights violation.

Thus, none of these encounters between Mr. Pacheco and Mr. Mapson was so markedly hostile or objectively unreasonable so as to rise to the level of creating a civil rights violation. With respect to Plaintiff's contention that he was denied the opportunity to contract for a wheel alignment service that was otherwise afforded to non-Hispanic persons, the Court notes that this contention is based on Plaintiff's allegation that individuals with "non-Hispanic" last names received wheel alignments that day while he did not. However, in response, Defendants note that the other customers who received wheel alignment services were not "similarly-situated" because those other customers did not have problems with their tie rods. Defendants also note that at least one customer with an "Hispanic last name," Larua Rodriguez, did obtain a wheel alignment on February 16, 2005. Plaintiff has failed to present any evidence to show that non-Hispanic customers received more prompt or cordial service or were similarly-situated and were able to obtain service while Plaintiff was not. Based on the evidence presented, the Court finds that Plaintiff has failed to establish that he was deprived of services while similarly-situated individuals outside the protected class were not.

          b.        Defendants' Legitimate Non-Discriminatory Reason

Moreover, even if the Court were to assume that Plaintiff could make out a prima facie case of discrimination, Defendants could still rebut the resulting inference of discrimination by presenting a legitimate, non-discriminatory reason for their actions. In that regard, Defendants have presented evidence to establish that on the evening of February 16, 2005, the Auto Center was busy and had many vehicles in the shop for service, based on the work order records for that day.[1] In addition, only one technician who was able to perform wheel alignments, Mr. Jeffries, was on duty that day. The wheel alignment ahead of Plaintiff's vehicle took a considerable amount of time, and Plaintiff was told at 6:00 p.m. that he was next. When Mr. Jeffries examined Plaintiff's vehicle, he determined that there was a problem with the tie rods and that there were safety concerns with performing the alignment without replacing the tie rods. Because the parts department was closed, he could not obtain the tie rods and perform the alignment that evening. Mr. Jeffries' contentions in this regard are supported by his notes on the work-order and the computer diagnostic of the vehicle, which were generated at approximately 7:00 p.m. on February 16, 2005. In addition, Defendants note that Mr. Jeffries made this determination well before he met or spoke with Plaintiff. Based on this showing, the Court concludes that Defendants have presented a legitimate, non-discriminatory reason for the delay in reaching

---

[1] The Court notes that the work order records, which are attached to Mr. Jeffries' Affidavit [Document #29] as Exhibit D, include other customers' names and account numbers. Therefore, the Court will order sua sponte that Exhibit D be placed under seal.

Plaintiff's vehicle and the ultimate determination that they could not perform the wheel alignment service on Plaintiff's vehicle that evening.

    c.   Plaintiff's Pretext Contentions

In response, Plaintiff argues that Defendants' stated reasons are pretext for discrimination. Plaintiff points to the fact that he obtained an alignment from Tire King a few days later, although he does not present any documentation or information from Tire King regarding the condition of the tie rods on his vehicle. Plaintiff also questions whether the Sears Auto Center was in fact busy, whether the vehicle before Plaintiff's actually took a long time, and whether Mr. Jeffries was in fact the only qualified technician on duty. However, Plaintiff presents no evidence other than speculation and conjecture to challenge Defendants' stated reasons. As with any factual issue, Plaintiff may not rest on mere allegations, denials, or unsupported assertions, but must provide evidence of a genuine dispute. Anderson, 477 U.S. at 248–49, 106 S. Ct. at 2510. Therefore, having considered all of the evidence presented by Plaintiff, the Court concludes that Plaintiff has failed to present sufficient evidence to establish a genuine issue as to the falsity of Defendants' stated reasons.[2]

---

[2] Although not raised by Plaintiff in the summary judgment briefing in this case, Plaintiff may also be attempting to proceed under the "mixed-motive" theory used in employment discrimination cases as outlined in the Supreme Court's decision in Desert Palace, Inc. v. Costa, 539 U.S. 90, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003). This Court has previously held that where a plaintiff proceeds on a "mixed-motive" theory, in applying the final step of the McDonnell Douglas burden shifting scheme, "the plaintiff must then offer sufficient evidence to create a genuine issue of material fact 'either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected

Having so concluded, the Court finds that, viewing all of the evidence in the light most favorable to Plaintiff, Plaintiff has failed to present sufficient evidence from which a reasonable jury could find that Defendants intentionally discriminated against him on the basis of race during his visit to the Sears Auto Center on February 16, 2005. Any factual discrepancies alleged by Plaintiff are either based on speculation and conjecture, or are not material to the ultimate conclusion because even if Plaintiff's version of all genuinely disputed factual issues is taken as true, Plaintiff's factual allegations are not sufficient to support an ultimate finding in Plaintiff's favor. Therefore, Defendants' Motion for Summary Judgment will be granted as to this § 1981 claim.

B.      42 U.S.C. § 2000a

Title 42 U.S.C. § 2000a states that "[a]ll persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion or national origin." 42 U.S.C. § 2000a(a). However, because Plaintiff has failed to present sufficient evidence to create a genuine issue of material fact

---

characteristic (mixed-motive alternative)." Rishel v. Nationwide Mut. Ins. Co., 297 F. Supp. 2d 854, 865 (M.D.N.C. 2003) (quoting Dunbar v. Pepsi-Cola Gen. Bottlers of Iowa, Inc., 285 F. Supp. 2d 1180, 1198 (N.D. Iowa 2003) (emphasis omitted) (citations omitted)). However, this Court need not reach the question of whether this analysis should be imported into cases involving alleged violations of § 1981, because even if Plaintiff were attempting to proceed under such a "mixed-motive" alternative in the present case, Plaintiff has still failed to present sufficient evidence from which a reasonable jury could conclude that race was a motivating factor in the decision not to perform an alignment on Plaintiff's vehicle.

18

with respect to his § 1981 claim, as discussed above, his claim for public accommodation discrimination in violation of 42 U.S.C. § 2000a(a) fails as well. Therefore, Defendants' Motion for Summary Judgment will also be granted as to the public accommodation claim.

III. CONCLUSION

Therefore, for the reasons discussed above, the Court finds that Defendants' Motion for Summary Judgment [Document # 27] should be GRANTED, and this case will be dismissed with prejudice.

The Court notes that Defendants have also filed a Motion for Attorney's Fees [Document #42] for $240.00 related to a discovery dispute that has now been resolved. The Court in its discretion concludes that an award of sanctions would be unjust in the circumstances, and the Motion for Attorney's Fees will therefore be DENIED.

Finally, the Court notes that certain work order records, which are attached to Mr. Jeffries' Affidavit [Document #29] as Exhibit D, include other customers' names and account numbers. Therefore, the Court will order sua sponte that Exhibit D be placed UNDER SEAL.

An Order and Judgment consistent with this Memorandum Opinion will be filed contemporaneously herewith.

This, the 26th day of June, 2006.

_____<br>
United States District Judge